The first case for argument this morning is 22-1654 Contour IP Holdings v. GoPro. Mr. Cavill, please. May it please the Court. Contour invented and claimed an improved video camera requiring a specific configuration of a camera processor. Neither the camera nor the claimed processor are an abstract idea. Did you really improve the camera, and do you really need that to establish that the patent is eligible? The camera processor is the key to the improvement. The configuration of the camera processor is new, was nonconventional, and is what teaches how to achieve the result. You're not claiming the camera itself, are you, the POV? It's an improved camera, so we're claiming an improved camera. The improvements are generated by what the configuration of the camera processor was. How do you view the claims? Is there a method, a system? No, it's a device claim to a camera. So can you show us in the claim language what you're saying? You've improved the configuration. Where is the claim language? It starts with a camera processor configured to. Yes. And it includes the other elements, including the wireless connection protocol, because that has to work with the camera processor, something that had never been done before. But configuring the camera processor to receive the video image data directly or indirectly from the image sensor, and then generate from the video image data. So what did you invent? What is different here in the technology that wasn't in existence? Sure. Not in existence before was generating in parallel from the same video image data, two image streams of different quality, and then taking only the low resolution stream and sending that one wirelessly to the handheld device. Okay, I'm really sorry. Be patient with me. I don't understand. You didn't invent how to do stuff. It seems to me you invented or came up with the idea of how to use these existing things and put them together in a way to do something. No. Now you're saying you did more than that. Absolutely. So point me, what device did you invent? Or did you invent the process, the device, what? Just like in any software claim where the software has a specific routine or configuration to use a general purpose computer, and you say in all these cases that if you claim the specific way and not just the result and say do it on a computer, then that's new and that's novel and that's inventive and that passes the abstract idea test, right? In this case, there was a camera processor. The camera processor had never before done what is in those claim elements that I just read. Generate in parallel from the image data sensor two streams where one stream is lower resolution than the other and then take only the low resolution stream and send that off to the handheld device. That was never done. There was never a processor configured to do that. And so that is what the inventors came up with and claimed. That's a process you just described, correct? It is a – it uses a process, but it is how you configure the processor to achieve the result. I understand that. Yes. And it seems that your argument is that the claim to advance here is found in the claim that deals with generate, the generation claim. Correct. And from that, you get two different data flows or streams. You get the high resolution and the low resolution, only the low. Well, that's a method, isn't it, or a system? I mean, you can patent a method. Yeah, and there are claims. Yeah. The claim 11 is the representative claim we agreed to that. That is the device claim where the camera processor is configured to do those steps that we just talked about. There were also method claims in the patents. Where do you tell us how you're configuring? Simply right there in claim 11 where it says – I mean, you're claiming a result. We've configured it to do X, Y, and Z. Do you explain – you're claiming that's a technological advance. So are you telling us – where is it saying how you achieve that? The camera processor configured to receive the video image data directly or indirectly from the image. That the processor could do before. Generate from the video image data a first image video data stream and a second image data stream of different resolutions. Couldn't it have done that before? No. There is no evidence in this record. While the camera processor could create a high resolution and a low resolution, there was no evidence in the record and there's nothing that's ever been said that they generated it in parallel from the same image data, which was important to this because if you remember what the invention is trying to solve, it says I've got an action camera, a POV camera, and I'm going to mount it on my helmet. And now I can't see it. I don't have a viewfinder. It's not on a tripod. So I need to see what am I trying to record? Am I getting the right shot? So where do you tell us how you're – if you're claiming this is inventive, how you're claiming what generating in parallel was inventive? Yes. And where do you describe to us the technological advance or how that's done? Is that in the specification? It's in the specification, which talks about the many ways you can do this. This is not a preemption case where we claim the result. I know, but a lot of our 101 cases come down to claiming the function of the result, and that's a problem. So you're claiming generating it in parallel. That seems to be kind of a result thing. And I'm asking for how you do that. If you're claiming that's inventive, where the patent tells us how you do that. The patent tells you in the claim language to generate in parallel, which is part of the claim construction, and in part where the court went off a little bit in its articulation of the idea because it left out its own claim construction. As cases say, you must include the claim construction if we're post-Markman hearing in determining what the claim is directed to. But generate from the video image data wherein the second image data stream is higher. Both streams have to come from the video image data. And what you saw, this problem was attempted to be solved by others, including GoPro, who failed, and then looked at the Contour device, copied it, and that's why they were found to infringe, and Boland, the ARC that they cited at the PTAB. Those are the only three that were trying to use a camera processor to solve this problem. Boland didn't generate from the video image data, and that's where the in parallel comes from. Boland generated serially. And where is the in parallel language in the claim? It's from the PTAB and from the court's claim construction. The district court construed the claim generate to mean in parallel from the same image video data. Again, is there anything you can point to me in the spec as to how that is done? Yes. Because the in parallel doesn't even appear in the claims. You're right, it's okay if it's part of the claim construction,  No, because if you did what Boland did. See, what Boland did was say, how do I get a preview of what's being recorded? And Boland took the processor and said, okay, I'm going to configure the processor to record in high resolution and then go back and take a piece in time earlier, take that snippet, download it to a lower resolution, and then stream that. So essentially what you're looking at as what Boland called a preview is a flashback from what you recorded a minute ago, 30 seconds ago, which doesn't work if you're trying to ski and have your camera right. So what the inventors here did is say, we're going to configure the processor in a different way. We're going to take the image data and at the same time in parallel from that same image data, we're going to send one high resolution stream to the memory and one low resolution stream wirelessly off so you can see it on your device. And are you claiming that's a technological advance or that's just a great idea that you had about how to do something new and different? Boland and Contour both had the great idea. Let's have a wireless preview. Both did it very differently with the same camera processor. GoPro tried it on the same camera processor and wrote TBD. We're not sure if this will work and wasn't able to make it work. So it's not just the idea. We came up with a specific way to configure the processor. And you keep saying it's generate in parallel, but I'm trying to understand what generate in parallel means. If you came up with this is some new technological advance generating in parallel. Right. I want to see what that means. It means from the same image data, right, rather than many other ways you could do it. You could have the data come out of the camera processor at a high resolution and then send that to the record and send that to the handheld. And that would just be one stream. I think that the definitive term here is not generate. Generate was construed, and it was construed to mean to record in parallel, not to generate in parallel, to record in parallel. Correct. And what existed before this invention is you could put the camera on top of your helmet and go ski, but you couldn't see what it was recording. Correct. And what this did, it recorded two streams, one high resolution and one low resolution. And the low resolution, you cannot send to your device because of bandwidth and all this other stuff. But the low resolution, you can. So am I correct that your claim to advance is this recording in parallel to video streams and sending the lower formatted video screen? That's what goes to the handheld device, and that allows you to. So now skiers could ski and see themselves while they're skiing, as dangerous as that may be. Yeah, and the problem with GoPro tried to solve this as well. And they tried a different way. Let's try and send a picture, one image at a time. And they couldn't make it work, and they ended up, later you'll see in the record, it says they were very surprised. And they said, oh, we should have thought of dual streaming. Boland came up with his own way, but the problem we were just talking about is it doesn't create a real-time preview. It creates a preview from 15 seconds ago. So if you think, okay, let me see where I am. When I got off the chairlift, my camera was right, but it jostled when I started to ski. Now you don't know it because you're looking at a flashback. Oh, please. Mr. Campbell, I was looking at the patent, and this was sort of triggered by some of the questioning from my colleagues. It almost sounds like, and I'm particularly thinking about your colloquy with Judge Reyna a moment ago, it almost sounds like this is a method claim. And you do have a method claim, Claim 22, correct? Yes. What is the – maybe I should know this from the record, but I don't. What is the status of all of the other claims? Do they rise or fall on this? Yes, because this claim was determined to be representative of the claims, but this is the claim that's at issue in this case. We argued only one, but separately the method claims could be argued later, but this is the device claim. So in other words, if this claim were to fail, okay, you're saying you would still have viable Claim 22, for example? I believe that's correct, but I'd have to be sure in the record. But we agreed that Claim 11 was representative. Oh, yeah, no, I understand that, because it almost seems like what we've been talking about, the colloquy here, it almost seems like this is a method rather than a device. It is, yeah. And like in any case where you improve, you use some improved computer software to do something, the software may be the key, but it's an improved device, right? The method in itself doesn't achieve anything, because the issue was how do we make this camera more usable? Is Claim 22 in the – was it in the original filing in the district court? I'd have to check, to be honest. This case went on – it's one of the interesting things of this case. This case went on for six years. Oh, that's right. You were up with the board and all. Correct. Because twice it was stated at the board, we were here on the board, found that GoPro's catalog was not prior art. This court said it was prior art, went back to the board, the board said it doesn't matter, none of that teaches the claimed camera processor configuration. That's here. Okay. Thank you. Judge Rainer? Yes, I'm concerned by your response to my initial questions as to what type of claim this is. You said that you were claiming the camera, and I have a problem with that, because I don't see that you've improved anything with the camera. In fact, your camera is a POV device, right? Right. And the field was filled with plenty of POV devices. There's all sorts of point-of-view cameras that were out there. I'm going to ask again, are you saying that your invention resulted in an improved camera? It did, Your Honor, in doing this method, right? But the method is different from the camera. I agree. And there are method claims and device claims, right? And so the camera includes the camera processor. Off the shelf, which is what Gautreaux tries to argue, the camera processor couldn't do this and didn't do this. But, sir, there were other cameras. There's other cameras that existed at that point, and it was well known to have a processor within a camera. It seems to me that what advanced the technology of POVs in this instance is the configuration of the processor. Correct. And the configuration which resulted in the generation point. I totally agree. But as in, you know, many patent claims, we didn't claim just a processor, right? A processor configured to do this because outside of the camera, the processor might have no use, right? So the claim summed to a camera. You're claiming a configured processor. Right. But I'm not trying to lead you to think we're claiming the lens is inventive. We're not saying the lens is inventive. That's what you're telling me when you tell me that you're claiming the camera. Right. Okay. And I didn't see this patent being a patent on an improved camera. I saw this being an improvement in how a camera functions in this area of sports and, you know, motion. It's fair to say. It's just in claiming, right, oftentimes the claim drafter will claim the device with this improved component. And that's claim 11. And we'll also claim the method of using the improved component. And that's claim 22, like you were saying. So I can't say it's not a claim to a camera. It is. That's how it was drafted. The invention lies in Contour's improvement to the camera processor in laying out a specific concrete way that you configure it that was never done before, and that resulted in what the invention does. I do think, just to follow up on Judge Shaw's point, part of Judge Reina's problem, I think you may have a problem. I don't know if it's undoable. But if there's a difference between claim 11 and claim 22, I thought when you agreed that 11 is representative, I think this case and all the claims rise or fall on claim 11. I think it may be. I think that may be true. I just don't want to overstate the record. But, you know, whether you call claim 11 a claim to a camera with a processor program to do an improved method, that's fair. That's what claim 11 is. And then the other claims may be simply just the method done on the processor that results in the invention. All right. Well, we're way beyond our time. I'll reserve some rebuttal and let's hear from the other side. Thank you very much. Good morning. Good morning. May it please the Court. Sean Pack on behalf of GoPro. Your Honors, I want to begin with some of the questions that were asked in response to the issue of whether there's any disclosure about this idea of parallel generation of video streams in the patent specification. And the answer is no. You will not find any written description of how a processor can be configured to generate video streams in parallel. Because that's not what these inventors invented. What these inventors invented as articulated as an advancement over the prior art throughout the briefing, throughout the oral arguments on summary judgment, is the idea of using the output of an image processor to send certain information wirelessly and to receive control signals wirelessly. That is what Contour repeatedly argued to Judge Orrick. And as Your Honor pointed out, that is a method that is a result of using a camera that had all of the existing conventional components inside of it. Their problem, if you read the patent, is you have a camera, you're using it, and you have a different device that you want to use in order to preview what you're shooting and to be able to control it. The idea and functionality of viewing and controlling... You acknowledge that the problem that the patent is trying to address is that you have a camera that is intended to be used in action or things of that nature. And that that camera, you cannot see what that camera is looking at. Whereas if you're holding the camera in front of your face, you can see what you're looking at. If you put it on top of your head, you can't see anymore. And yet, it's pretty nifty to be able to see what you're recording as you're moving along. I agree, Your Honor. That's what they told Judge Orrick. So if you look at, in the blue brief, page 26, if Your Honors recall, there was a motion to dismiss under Alice. Judge Orrick denied that motion and said that we'll need a fuller record. And in that order, on page 26 of the blue, you can see the excerpt. Contour pleads it came up with an innovative solution. The camera would stream... Where are you reading? Page 26, Your Honor. The camera would stream a low-quality video to our smartphone so that the user could watch what was being recorded, removed from the camera. It would store a high-quality video that would be the one ultimately used, and it would receive specified control signals and the smartphone so that the user could control the image removed from the camera. This is also reflected in the patents. And Contour states that, notably, the same innovative solution is still reflected in the patents for summary judgment purposes. So as articulated below, it had never been the argument that video generation done in parallel by an image processor was the claimed investment, and nor could Contour have argued it. But it is in the claim. It is in the claim. It is, as construed by Judge Orrick, as part of the claim construction. You have the recorded in parallel language that comes from the construction. But in the patent description of the alleged invention, and what Contour argued for purposes of this motion was not about parallel generation for one simple fact. Let's look at claim 11. Yes, Your Honor. And down towards the middle, it says, generated from video image data, a first image data stream and a second image data stream, wherein the second image data stream is of higher quality than the first image data stream. That's what's being described also here in this paragraph that you read. And as I understand the argument here, that's the claimed advance. And your problem, I think, is that the claimed advance is actually stated in the claim. And most of the time in these 101 cases, we don't have that advantage. We're looking around in the specification. We're looking everywhere. But here, the claims tell us what the claimed advance is, and it explains the method to us. And all that's in the claim. Don't you think that that is something other than an abstract idea? No, Your Honor, because what we see in the underlying record is the following. On this issue of parallel only means that you have the ability to output two video streams from the original source data. If that's all that means, then we have contour in the record. This is Appendix 21060, and I'll read this for the record. The evidence here not only does not corroborate GoPro's defense, but it proves that image processing for generating two video streams in parallel function of the umbrella chip, which was the prior art that was being discussed, was not created by umbrella by ARM. And it goes on to say that Contour's inventor was aware of other vendors, including Apple, that provided this dual video streaming functionality. So all of the conventional chips— Are you making an obviousness, sorry? No, Your Honor. What we're saying is that in Step 1, we're supposed to be looking at what is the advancement of the claimed invention over the prior art. What Contour has argued and what the record shows is this idea of sending or generating video streams in parallel from the same source data was the prior art. That was the conventional way things worked with respect to umbrella, ARM, and so on. So going back to what Judge Orrick found, and that they're not disputing this, is that if you read the patent, the claimed advance was not about parallel generation, but it was about wirelessly sending the output, one of those outputs, which is a low video stream, to a device. That solves the problem that Your Honor was talking about, which is I'm shooting something, and let's say it's mounted on my helmet. I have my phone that is not tethered by wire to the helmet. How do I get that preview of what I'm shooting? I send it wirelessly. But as you look at the claims, generation and sending are two separate limitations of the claims. The problem, as I saw it, as I read through it, the problem that's described in the patent, the specification, is not that you couldn't send data or video from the camera to the phone, but you couldn't do it while you're skiing, or you couldn't do it while you're doing these other sports. And the reason is, is because, and you tell me if I'm headed right on this, but the reason is, is that the device, the streaming would not support a high-resolution video stream. And that's what the conventional cameras did at that point in time. And what the addition does is said, let's not send a high-resolution video stream. Let's send a low-resolution. Let's have two video streams, high and low. And it's the low because it's a lower resolution. It's able to be captured by the device. Is that correct? No, Your Honor, because we can see, and this is in the figures 1E of the 954 patent. Your Honor alluded to this, that there were lots of conventional. What figure is that, Mr. Parker? Figure 1E, Your Honor. 1E, okay. 1E. This is Appendix 27. This is a 954 Appendix 27. And so these are emitted pieces of prior art POV cameras that already existed at the time the inventors filed the patent. And you can see, for example, in 1C and 1D, both labeled prior art, that the camera, which is the oblong-shaped device, is shooting the point-of-view video. But there's a preview screen that's on a separate camcorder, and they're tethered. So now you have the ability to view what you're shooting on a different device, the camcorder. But it goes on in figure 1E to show a different embodiment of an existing prior art system that is described as a goggle with a mounted camera. So this would be one that you would be using, Your Honor, when you're skiing. And it says that this camera, which is the circle in the middle, sends the video stream through infrared signal, which is a wireless signal at low-quality bandwidth. So all of this was emitted prior art. And we see that as well in contours. Well, the problem I'm having with your argument, and I know other judges have observed this in other 101 cases, but I haven't, is that it feels, and Judge Rayna said this, this feels like an obviousness case. You're saying there are several pieces of prior art. They didn't invent the prior art that was existing prior art. But as Judge Rayna said a few minutes ago, this was kind of a nifty idea. And I think Judge Orrick agreed this was kind of a nifty idea. So why isn't that the quid centennial – sorry. Why isn't that just an obviousness thing? There are existing pieces of prior art. They didn't invent them. But was there a motivation to put them together to come up with this nifty idea? And if there wasn't, and if it was really a new, different idea of combining pieces of prior art, why isn't that part of an obviousness analysis? This is the reason why we went to Chargepoint, Your Honor, as part of the analogy-based approach. Because in Chargepoint, you had the same issue and the same set of arguments, which was you had electric charging vehicles. Wouldn't it be a great idea or a nifty idea to network them together? And the patent owner said that was not done before, and that's not an abstract idea. And this court found in Chargepoint that the idea of using a network, whether it's wireless or wired, to have the ability to remotely view and control charging stations in itself was an abstract idea because the claims do not reflect any technological improvement in the networking technology, any type of improvement in the computing devices or the charging stations. They provided a generic environment. But the abstract idea in Chargingpoint, as I recall, was construed as it's just communication over the Internet. Yes. Over the network. How do you simplify the abstract idea here to be comparable? Because that's what Contour has said, and that's what the claimed advancement is if you read the patent. What Contour has said repeatedly in the lower court proceedings and what the patent says is you can use generic video processors, generic camera components, but I have this problem, which is what I'm shooting and where I want to look for preview purposes are in two separate locations. So the idea of the claimed advancement in this case is just like Chargepoint, where you send video stream information and control information wirelessly. But the claims, as Judge Warrick noted, recite no particular way of solving that problem from a networking perspective. It does not specify any particular networking protocol or interface problem. Here the claim does something different. It does divide the video stream into two. Which, yes. It seems to me that this falls right in the ambience of Carty on that. No, Your Honor, because the function of sending those, of dividing the two streams, as I pointed out, and this is in Appendix 21060, image processing for generating two video streams in parallel, one at a lower resolution and one for a higher resolution, was all conventional. That's what the prior art already provided. And furthermore, at Appendix 200497, the umbrella chip, which everybody agrees was a conventional chip. You're slipping back into a 103 analysis. No, Your Honor, because what I'm saying is the advancement is not about the generation of the parallel streams, whether it's in low resolution or high resolution. The advancement that Contour repeatedly argued in summary judgment was it's the idea of sending video information and control information remotely through any type of wireless network. And so for step one, when we look at ChargePoint, when we look at Hawk Technology case, when we look at the U case, it's an abstract idea because you're using conventional tools like a chip that could do parallel processing of video and provide low resolution as well as high resolution output and sending it wirelessly without specifying any particular improvement to the wireless connection. What about the use of a configured processor? I mean, and the processor can be conventional. Absolutely. But what I think Your Honor's got to in the earlier questioning is this is not about a particular type of processor configuration that is unique or improved or an advancement of the prior art. This is about using a method of using conventional tools like the umbrella chip that could produce parallel outputs, one in high resolution, one in low resolution. And the umbrella document specifically says the low resolution output, Your Honor, can be used for preview purposes. So that all of that was conventional. What is the advancement that's being claimed here is I'm going to send the video stream wirelessly to a viewing device, which could be a tablet or phone, any kind of general purpose device. And I can also receive controls wirelessly. That is the abstract idea that's being claimed because there is no other advancement. And just as Judge Shaw, Your Honor, referred to. What is the status of Claim 22? Yes. That seems a pure method claim. That's right, Your Honor. What we believe is there were a number of claims that were being asserted. At some point, claims were dropped by contour. Our understanding is that for purposes of this appeal, claim is representative of all possible claims that could have been raised in this dispute, which would include the method claims as well. So everything rises and falls together. So Claim 22 stands or falls depending on how this case goes. That's right, Your Honor. Does this case, does this Claim 11, that's the one that we've been discussing, it just seems to me almost to be a method claim. I realize that it's a claim to a device, the camera, with these various components. But the way it's been discussed, it seems like we're talking about a method. That's right, Your Honor. And just to analogize to some of the cases that we've been discussing, sometimes the circuit has used the word functional language. That if you're describing a result and you're not describing an actual improvement in the underlying hardware or components or even software, what you're saying is I'm going to use existing conventional components in a generic environment to carry out an abstract idea. Here the abstract idea is wirelessly sending some pieces of information to another site. If that's the abstract idea, if you perform that method, I use the Ambrella chip, I use any network component that exists, I get the result that I want, which is I have the ability. There's too much attention placed on conventionality at Step 1, whereas that really belongs to Step 2. Step 1 is we're looking and analyzing the claims. That's right, Your Honor. And not everything's surrounded that. That's right, Your Honor. Now, when I asked your friend on the other side what type of claims these were, he said it was for an apparatus. And then he also said that they were claiming a camera. And I have problems with that because I view this as a method. Now, look at Claim 11. It doesn't say it's a method. Does it matter? Does it matter if they claim this is a method? I'm thinking of one of the footnotes in, I think, an opinion Your Honor wrote, where you said it's not dispositive whether a claim is written as an apparatus claim or not. Exactly. And I think we're— You can invent, and almost all inventions are using conventional, well-known or known techniques. Because that's what exists. It's just using them in a different manner. That's right. But the issue, I think, for Step 1 to—and I apologize, Your Honor, because I did talk about conventionality, which I think is more of an issue for Step 2. But for Step 1, starting with the claim language itself, which what Chargepoint and the other cases tell us, what does Step 1 say about the advancement over the prior part? That's really the issue. Is it an abstract idea, or is it claiming something— No, no. The first question under Step 1 is whether the claims are directed to patent-ineligible subject matter. That's right. Such as an abstract idea. Right. And it's the idea, so I think that that's the inquiry. That's right. And if the answer is yes, I mean, if a claim shows you where it's headed and how it's getting there and what it got, I mean, if the claim is a complete package there, don't we move to Step 2? And then you can argue conventionality, whether they arrange things in such a fashion that they've made the entire stream of the well-known art, made it nonconventional. I agree, Your Honor, and I think that's what the case law is telling us. And the point I'm making is everything that we've heard about this parallel generation is not what Contour argued in district court was the abstract or the idea behind the claim language that makes it different than the prior art. Did Contour, in your view, simple question, did Contour invent the method to use two data streams and to send the lower resolution data stream to the device? No, absolutely not. That's not the, as we saw in the Figure 1e. They didn't invent it because it existed already? It existed already, number one. Number two, what they have said throughout, because as Your Honors noted in the briefing, we had a separate pending summary judgment motion on inequitable conduct and improper inventorship that said Ambrella was the company that contributed all the processing technology, including parallel generation and low video streaming. What they have said that they invented is wirelessly sending information, that there are two types of information being claimed, video data. What if I look at the claims and I disagree with their characterization? I think we can. I think there are two issues, Your Honor. One is I think Your Honors noted this in the Adobe case, the TEPC case, that it's important to preserve the record in terms of the appeal, and we cannot have parties change the description of what the claimed events is. Here, when Judge Orrick looked at the issue of Alice, he did not look at anything related to parallel generation because Contour made the decision that they wanted to focus on the wireless piece, the remote viewing, and that's consistent with the patent specification because there is no description of anything to do with parallel generation. Or even in the claim language, Your Honor, it doesn't say send only the low-resolution video. It's a comprising claim, and the method claims are similarly phrased as well. What they focused on was the wireless sending of information, which takes us back to ChargePoint, Affinity Labs, and all the other cases that we cited, including Hawk Technology. Just let me ask a housekeeping question at the end. There's some confidentiality markings. Do those still hold? You mentioned some of the stuff today. Yes, Your Honor. They do not hold with respect to anything Your Honors may cite. I think when we prepared the appendix, there were some third-party materials that we wanted to preserve in terms of confidentiality, but everything that we've argued, everything that we've discussed, we don't believe requires sealing with respect to the order. Okay. Thank you. Thank you, Your Honor. Thank you. Thank you. So we've got one more over. No, we're done. We're going to restore, keep it even, five minutes if you need it. Thank you, Your Honor. Okay, if I can quickly address what GoPro's counsel said. He was asked directly, did Contour invent the method, and he said no. GoPro claimed in this case and continues to claim that their CEO, Nick Woodman, invented Claim 11, invented the method that is claimed here. So for him to say no is directly contradictory. Claim 11 isn't a method, right? Right, but the part of Claim 11, how it's processed, he claims to have invented that, number one. Number two, he raised a charge point. So you're saying that Claim 11 is a method claim? I'm saying, no, I'm not saying that, Your Honor. I'm saying Claim 11 is drafted, as often claims are, where it is a device, where it has an improved configuration, and that results in the camera performing the method or the camera processor performing the method. Let's use the technical term here. Is Claim 11 an apparatus claim? Claim 11 is an apparatus claim. The novelty is in how the processor is configured, and that is what is not abstract. The camera processor configured to do this way is not abstract. And I know that you asked do we look at conventionality at Step 1, but many of the cases do look at conventionality in Step 1 because they say you must look at what is the claimed advance over the prior art. You have forced me to look at Claim 11 and to look at the camera and see what you've done to it, and that's going to be hard. But if I invent a new mousetrap, right, and what promotes the mousetrap is a new spring that I invent, and that spring acts in a certain way because how I've configured it. You did not invent the idea of a mousetrap. Correct. You didn't invent the screen, so the spring either. And we don't claim to have invented the camera or the lens. Yes, you do. You told me that. Right. But what I'm saying, you can't break a claim into elements. That's not how we look at it and say is each element old in the art, right? We're not supposed to do that. We looked at the claim as a whole. The claim as a whole is to a camera with an improved processor configured in this specific way. Okay. Can you just tell me how you think we could possibly just differentiate this case from you and or ChargePoint? Absolutely. In ChargePoint, it said network these devices. It gave no explanation at all of how. It gave no description of how it was networked, and it didn't say here's an improved configuration for the network. Here, we say configure the camera processor in this particular way to do these particular things. And you're saying you invented the new way of doing it. Absolutely. That is the… And then you. And then you, very different case because in you, number one, there was no description of how. It said process the image, enhance the image in some way. I think that's the language that was used in the case. Enhance the image in some way. We're not saying create a wireless real-time preview using a camera processor in some way. We're saying configure the camera processor this specific way distinct from any way it was ever done before, and that is the invention. So that's very different from you. Number two in you is that in you, both parties admitted this had been done for over a century. Enhancing one image with another image had been done for over a century. So it was kind of the classic take what was done before and do it on a computer. This is a case where no one had ever done it before, and it wasn't just said do it on a computer. It was said do it with these specific steps and these specific configuration. So that's the distinction from you. It's a completely different case. Number one, they pointed to… No other questions. They pointed to the prior art in the patent, and the prior art in the patent is just that. It's prior art that did not do it, did not have processors configured this way. None of these did parallel generation. And I think you'll see in appendix 23515 that GoPro talks about how it was done in the prior art, and it's similar to all these. What would typically happen is you'd have a flip-out screen or you'd have a preview on the back of your GoPro, and when you press record, the preview screen would shut off. So it would redirect the stream. You didn't have two streams generated in parallel. You had one stream going to the preview, and then that would be shut off, and then you'd have the stream going to the record. The big misrepresentation that GoPro has made throughout this, and they made again today, is that this was a conventional processor, and that's not the case at all. And if you look throughout the red brief, whenever they say that, there are no sites to the evidence. Well, what's your site to the specification that you invented? You said this is not a conventional processor. Correct. We claimed it new, and that's why. And where is the written description for this new processor? It's at column 20, I believe, and the specification points out multiple ways, including this two streams with low resolution. It also points out multiple unclaimed ways, reduced frame rate, fast photo. Those are different ways you could have made the preview, could have configured the camera processor, but we didn't. We chose to claim one specific way. So is that 20? I didn't want to hear what you didn't claim. I wanted to hear what you claimed and where the written description for that is in the specification. So can you point me to anything? I will. It's at appendix 71, column 20, where we talk about, it precedes that in column 19, but in the first full paragraph, starting at about line 7, it talks about alternative implementations of remote view, and then it talks about you can have reduced resolution, and then it goes on later to say in which the lower quality file is streamed or played back after the recorded action has taken place. So now the played back is what Bolin did, and this streamed, only the lower resolution, is what we decided to configure the processor to. And I would point you to the evidence at page 59 in our blue brief and 60. And 59, it wasn't explained because we tried to do the don't go to conventionality, which is what GoPro has done. GoPro has essentially argued this as an obviousness case because they lost obviousness at the PTAP, so they tried to re-resurrect it. We are way out of time, so you just want to cite us to 59 and 60? The PTAP particularly, appendix 21128-19, that's Varos, the founder of Contour, who says, no, the dual streaming was our idea. We gave it to Umbrella. And the one before it, 21103-04, that's O'Donnell. That says she gave the use case to them. And just one last thing, there's an O'Donnell email at... You cite that E3? Yes, yes, yes. There's an O'Donnell email at 20826, where she specifically says, I'm excited about a dual stream mode and GPS. Those were both Contour ideas. And the point that they point out, the Umbrella diagram, comes three months after that. And it says for Contour only. We need to. Thank you, Yolanda. Thank you very much. Thank both sides and the cases submitted.